IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**JOHN BARLOW v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 05-09058        James C. Beasley, Jr., Judge**

_____

**No. W2015-01647-CCA-R3-PC  -  Filed September 9, 2016**

_____

A Shelby County jury convicted the Petitioner, John Barlow, of aggravated child abuse and aggravated child neglect, and the trial court sentenced the Petitioner to an effective sentence of twenty-five years.  This Court affirmed the Petitioner's conviction for aggravated child abuse but reversed and dismissed his conviction for aggravated child neglect, noting that the holding did not change his sentence.  *State v. John Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *1 (Tenn. Crim. App., at Jackson, Apr. 26, 2010), *perm. app. denied* (Tenn. Sept. 24, 2010).  The Petitioner filed a petition for post-conviction relief in which he alleged that that his trial counsel was ineffective.  The post-conviction court, after a hearing, denied the petition.  On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Eugene L. Belenitsky, Memphis, Tennessee, for the appellant, John Barlow.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Amy P. Weirich, District Attorney General; Ann L. Schiller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A.  Trial**

This case arises from a brain injury suffered by a two-year-old child, Q.B.[1]  For this injury, a Shelby County grand jury indicted the Petitioner for aggravated child abuse and aggravated child neglect.  Our Court reiterated the facts presented at the Petitioner's trial in our opinion disposing of the Petitioner's direct appeal.  *Barlow*, 2010 WL 1687772, at *1-7.  We base the following summary of the facts on that reiteration.

During the early morning hours of August 3, 2005, Dr. Robert Sanford responded to a call from LeBonheur Children's Hospital about Q.B.'s injuries.  He said that she suffered a severe brain injury with a skull fracture.  Her brain was extremely swollen, which appeared to be caused by two separate blows.  Dr. Sanford performed surgery on Q.B. to remove a portion of her skull, which he saved to reinsert later, and then reclosed her scalp in an attempt to reduce the residual effects of the brain swelling within her skull.  The doctor noted that, as a result of her injuries, Q.B. had a "steppy gate" and her left hand turned in slightly making her unable to perform fine finger motions, such as playing the piano.

Dr. Sanford testified that Q.B.'s skull fracture was linear and could only have been caused by significant force, such as falling from a two-story window.  Additionally, she had an acute subdural blood clot that was caused by a high-speed injury like a car wreck or falling down a flight of stairs.  He opined that Q.B.'s head would have had to hit an immoveable object to cause this type of injury.  Dr. Sanford stated that Q.B. would have displayed symptoms of her injury immediately and that timely medical treatment when dealing with skull injuries such as this was important to long term recovery.

Dr. Karen Lakin, with LeBonheur Children's Hospital, testified that she spoke with Q.B.'s maternal aunt, Tiffany Williams, and the Petitioner, who was Ms. Williams's boyfriend.  Both Ms. Williams and the Petitioner confirmed to her that the victim had been healthy before the morning of her hospital admission.  The Petitioner informed the doctor that he was the primary caregiver for the victim and Ms. Williams's two other children.  The children were playing together during the evening before the victim's hospital admission, and the children went to bed at around midnight.  During the early morning hours of August 3, 2005, Ms. Williams left to take her brother to work, and the Petitioner heard the victim moaning and discovered that she had wet her bed.  The Petitioner told Dr. Lakin that, when he cleaned the victim, she did not awaken, and he realized something was wrong.  He called Ms. Williams, and she returned.  The two discussed whether the victim was sick or sleeping, and ultimately decided to gather the children and drive to the nearest fire station and then on to the Children's Hospital.  Dr.

---

[1] In order to protect the privacy of minor victims, it is the policy of this Court to refer to minor victims by their initials only.

Lakin testified that bed-wetting situations were "stressful situations" for a parent or caregiver.

Dr. Lakin testified that she noticed bruises on the victim's face, forehead, and abdominal area. She found the abdominal bruising odd given that children usually catch their falls with their hands. The doctor noted that the victim's brain had swelled so greatly that it had shifted to the left, placing a lot of pressure on her brain. Dr. Lakin opined that this was not an accidental injury. She testified that the victim's injuries were the result of "abusive head trauma." Testing showed that the victim suffered retinal hemorrhages in both her eyes, which can be caused by shaking or impact. Dr. Lakin recalled that, at the time of the victim's discharge, the victim had lost motor control on her left side, meaning that she had to relearn to walk, eat, and talk. The victim also suffered seizures. She further stated that it was uncertain how the head trauma would affect the victim's long-term intellectual development. Dr. Lakin opined that the victim's injuries occurred around the time of the bed-wetting incident and were related thereto.

Ms. Williams testified that, at the time of Q.B.'s injuries, Ms. Williams lived with the Petitioner, their daughter, her son, and her niece, Q.B. Ms. Williams recounted that Q.B. did not have any injuries before this date and that she had not been born with any health defects or have a history of seizures. She recalled that, before her injuries, the victim could walk, talk, and was in the process of potty training. The weekend before her hospitalization, the victim acted normally and did not have any bruises. On August 2, 2005, the victim acted normally and played with the other children. At around 7:30 or 8:00 p.m., the victim was hit on the head with a door while the children were playing. Ms. Williams told the Petitioner to make the children stop playing the game after the victim's injury. Ms. Williams said that Q.B. went to sleep at around midnight that evening and was sleeping normally when Ms. Williams left the house at around 2:10 or 2:15 a.m. on August 3, 2005, to take her brother to work. When she returned at around 3:00 a.m., the Petitioner was awake. Ms. Williams went immediately to sleep. The Petitioner awoke her and said that there was something wrong with the victim because she was asleep with her eyes open. Ms. Williams told the Petitioner that she was trying to sleep, and the Petitioner showed her that the victim had bitten her tongue, causing it to bleed. The Petitioner then showed her that, when he tried to pull the victim's arms, she immediately "clenched [them] back together." Ms. Williams believed that the victim was having a seizure.

Ms. Williams testified that, following the injury, Q.B. had been hospitalized for between two and three months. After she was discharged, Q.B. still had trouble with her gait, trouble with her leg, arm, and eye, and she kept one of her hands "balled up." The victim had to participate in both speech and physical therapy.

3

Reginald Fort, the victim's uncle, testified that he had spent the afternoon of August 2, 2005, at the apartment of Ms. Williams and the Petitioner. Mr. Fort said that Q.B. acted normally during his stay. He recalled an incident that occurred that day when the Petitioner hit the Petitioner's daughter with an open hand on her back because she played with a video game controller. Mr. Fort said the Petitioner hit his daughter "like [she was] a grown person" even though, according to Mr. Fort, the Petitioner's daughter's disobedience was not "that serious." Mr. Fort said that he did not see anyone hit Q.B. and that he left the apartment between 1:50 and 2:15 a.m. when Ms. Williams took him to work. He estimated that his place of employment was fifteen minutes from Ms. Williams's apartment.

The Petitioner testified that he and Ms. Williams dated in high school and then had a child together. Q.B., he said, came to live with the Petitioner, Ms. Williams, their daughter, and Ms. Williams's son, three months before her injury. The Petitioner said that he became the primary caregiver for the children after he was laid off from his job as a cashier. He said that he did not strike the victim and that he did not see anyone else strike the victim. He said he left the apartment on August 2, 2005, for twenty minutes between 3:00 and 4:00 p.m. The Petitioner said that Q.B. was acting normally when she went to bed at around midnight. He said that he put the other children to bed at around 2:00 a.m. and heard a humming sound. He checked on the children and noticed that the victim had wet herself. He said that, as he placed a diaper on her, her body felt "limp," which scared him. When Ms. Williams returned home at around 2:45 a.m. he told her that he thought something was wrong. Ms. Williams told him that she thought the victim looked fine and went to sleep. The Petitioner said that he sat on the couch, worried, and again checked the victim. He noticed that she was not moving, so he turned on the lights and saw that her eyes were half-open and that she was biting her tongue. At around 3:15 a.m., the Petitioner touched the victim's mouth and her "body locked" with her arms clamped to her side. He again awakened Ms. Williams, and they gathered the children and drove to the fire station and then to the hospital, arriving at the hospital at around 4:00 a.m. The Petitioner reiterated that he did not injure the victim.

The Petitioner agreed that he did have the other children awake and dressed so that he and Ms. Williams could drive Q.B. to the hospital as soon as Ms. Williams returned home. He also admitted that he and Ms. Williams did not immediately take Q.B. to the hospital as soon as Ms. Williams returned to the home, saying that it took him an hour to convince Ms. Williams to go to the hospital. The Petitioner said that the only child that received a spanking on August 2, 2005, was his own daughter, which he spanked two or three times at most.

Based upon this evidence, the jury convicted the Petitioner of aggravated child abuse and aggravated child neglect, and the trial court sentenced him to concurrent

sentences of twenty-five years for the aggravated child abuse conviction and fifteen years for the aggravated child neglect conviction. On appeal, this Court concluded that the evidence was insufficient to sustain the Petitioner's conviction for aggravated child neglect and reversed and dismissed that conviction. We held that, as the trial court ordered that his sentences run concurrently, the Petitioner's sentence remained unchanged. On September 24, 2010, the Tennessee Supreme Court denied the Petitioner's request for permission to appeal. *Barlow*, 2010 WL 1687772, at *1.

## B. Post-Conviction

On February 19, 2014, the Petitioner filed a petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel. Appointed counsel amended that petition in June 2014. In explanation for his late filing, the amended petition asserted that, while the Petitioner was aware that his application for request to appeal had been submitted to the Tennessee Supreme Court, he never knew that the Court denied his application. The petition stated that the Petitioner's family contacted his appellate counsel three years after the Rule 11 application had been filed, and appellate counsel informed them that the Rule 11 application had been denied. In January 2014, appellate counsel visited the Petitioner in prison, explained the situation, and assisted him in creating the petition for post-conviction relief.

On July 17, 2014, the State filed a response to the Petitioner's petition for post-conviction relief alleging that the post-conviction court should dismiss the petition as time-barred. The post-conviction court denied the State's request and held a hearing on the merits of the petition. At the hearing, the parties presented the following evidence: The Petitioner testified that two attorneys represented him during his trial, Counsel and Co-Counsel. He said that he mostly interacted with Counsel and only met Co-Counsel once before trial. The Petitioner said that he and his attorneys discussed that Co-Counsel knew one of the doctors who would be testifying at trial, Dr. Sanford, because the two had worked at LeBonheur Children's Hospital together. Counsels asked if the Petitioner had a problem with the fact that Co-Counsel and Dr. Sanford knew each other, and the Petitioner said no.

The Petitioner said that neither counsel ever reviewed the medical records with him. He further said that the only real conversation he had with Counsel was five days before his trial. Their conversation centered around Counsel's advice that the Petitioner plead guilty. The Petitioner said he attempted to explain his innocence but Counsel said that the State wanted a conviction and would get one. Counsel further told him that he could plead guilty and receive a sentence of eight years or spend the next twenty-five years in prison. The Petitioner said that he agreed to enter a plea of guilty, but he asked Counsel to investigate his explanation of the events surrounding Q.B.'s injury. He said

5

that he informed Counsel that Ms. Williams had seen Q.B. get hit in the head with a closet door.

The Petitioner testified that the following day he came to court and informed Counsel that he did not want to enter a guilty plea. The Petitioner asked the trial court for a continuance because he wanted time to find a new attorney, but the trial court denied his request. The Petitioner said that he signed the plea agreement to eight years to be served at 30%, and then the State informed him that their offer no longer stood. The new offer was for fifteen years at 100%. He did not take that offer.

During cross-examination, the Petitioner said that in 2006 the State had offered him an eight-year probation sentence in exchange for his guilty plea. The Petitioner agreed that he was not interested in taking this offer and wanted to go to trial. He felt that Counsel did not "defend" him at trial. The Petitioner said he thought that Counsel could have done a better job investigating his case.

The Petitioner said that he did not complain to the judge about Counsel's performance any earlier because he thought he had nothing to worry about since he was innocent. Then, when Counsel repeatedly told him that a jury would convict him, he decided to enter a guilty plea. The Petitioner's family implored him to find another attorney, so he asked the trial judge the following day for time to hire an attorney. He said that after the trial judge denied his request, he did not feel like he could mention again his displeasure with Counsel's representation.

During redirect examination, the Petitioner testified that he had no criminal history and was unfamiliar with the criminal process. The Petitioner said that Counsel never spoke with the Petitioner's family, who could have been character witnesses for him. Counsel also, to the Petitioner's knowledge, never spoke with the fire fighters at the fire station where he and Ms. Williams stopped before going to the hospital. Counsel also never discussed getting an expert to testify on the Petitioner's behalf. The Petitioner said that he and Counsel never discussed Counsel's theory of the case.

Upon questioning by the trial court, the Petitioner reiterated that he had no idea that Q.B. was injured until he heard her humming during the night and found her limp. He said that Counsel told him that Co-Counsel was also a nurse and worked at the hospital and intended to help with the medical aspect of his case.

During further direct examination, the Petitioner testified that Q.B. put herself to sleep that evening by lying down on her bed at around midnight. He later covered her with a blanket. The other children stayed up playing. He explained that they were all living in the same room in the apartment so, when the children got tired, they went to a

6

mat on the floor and laid themselves down to go to sleep. During further cross-examination, the Petitioner testified that Ms. Williams was gone when he put the other two children to bed at around 2:00 a.m.

Counsel testified that he met with the Petitioner "[s]everal times," a couple of times after court in his office, and then one meeting before the trial. Counsel said that Co-Counsel reviewed the medical records in depth before and discussed the findings with Counsel shortly before he met with the Petitioner to prepare for the trial.

Counsel said that he felt that the critical issue at trial was the timing of the injury, as there were no witnesses to the injury. He agreed the State's theory was that the Petitioner injured Q.B. while Ms. Williams was gone for an hour taking her brother to work. Counsel said the Petitioner said that Q.B. was acting fine after Ms. Williams left and before she went to bed. Counsel asked the Petitioner about the other possible ways that the child may have been injured, including whether Ms. Williams could have been responsible for the injuries. The Petitioner said he was unaware of anything and that Ms. Williams could not have hurt Q.B. Counsel said that his conversation with the Petitioner left him with no explanation for Q.B.'s injuries.

Counsel testified that he never looked into hiring an expert to testify during the Petitioner's trial. Counsel explained that Co-counsel was both a lawyer and a "pediatric emergency nurse," a position he had held for more than twenty years. In every case involving medical records, Counsel associated Co-counsel as second chair to help him with the medical testimony. Counsel asked Co-counsel whether being hit with the door could have caused Q.B.'s injuries. Co-counsel informed him that, given the manner in which the Petitioner testified that Q.B. acted following being hit by the door, it was not possible that the door caused the injuries. Counsel and Co-counsel discussed whether the other children in the home could have caused Q.B.'s injuries. The issue repeatedly raised by Co-counsel was that Q.B. would have displayed symptoms of her injury immediately after being injured. After reviewing the medical records, neither counsel opined the other children, who were also very young, could have caused Q.B.'s injuries. Counsel said that, based upon Co-counsel's experience and the evidence, he could not see how an expert would have assisted the Petitioner at trial. Counsel agreed that he was not aware whether a neuro-radiologist could look at a CT scan and say how old the blood on the CT scan was, in order to date the injury.

Counsel reviewed an affidavit by a doctor that stated that someone suffering an injury such as Q.B.'s injury may have a "lucid interval" before displaying signs of the injury. He said, had he known of this phenomenon, he would have consulted with Co-counsel about it. Counsel said that presenting such expert testimony would have been helpful to his case. Both experts at trial testified that, after suffering an injury such as

7

Q.B.'s, a victim could not "do anything" and would immediately display symptoms of the injury. If there was a "lucid interval," however, the injuries could have been caused by either of the other two adults present at the home. Counsel said that, after reviewing the affidavit, he would still hesitate to put such an expert on because there was no explanation about how often this phenomenon occurred. Depending on how rarely this occurred, this expert could be more harmful than helpful to the Petitioner's case. Counsel agreed that this expert could have also aided the Petitioner in his decision to enter a plea of guilt.

The post-conviction court admitted into evidence the affidavit of the expert. The following are questions posed to the proposed expert and her responses:

> *2) Is the skull fracture or subdural hematoma described in the attached medical records consistent or partly consistent with a door, pushed by an older toddler, striking this child in the head during rough play and while the child was running? See description of the accidental injury earlier in the day in the attached transcript.*

> The attached medical records contain reference to a right parietal linear skull fracture, a hematoma over the right temporoparietal region, a subdural hematoma, and cerebral swelling with midline shift. The description of the accidental injury earlier in the day was characterized as the child opening and closing the door, and as she went to run out, the door just hit her in the head, causing her to fall down; the child was reported to have gotten back up and started back playing. Given this information, it is my opinion that the accidental injury on the door could have caused the scalp hematoma and possibly the skull fracture, although it is unlikely; however, this minor household accident would not be consistent with the findings of the child's significant intracranial injuries (subdural hematoma and cerebral swelling).

> *3) Are there reports in the medical literature of increased intracranial pressure causing bilateral retinal hemorrhaging in young children? Could an accidental hit with a door to the head of a child, as young as this one, have caused a hematoma, which in turn increased the pressure inside the brain and caused bilateral retinal hemorrhaging?*

> In his November 2010 article in Pediatrics entitled, "Retinal Hemorrhage in Abusive Head Trauma", Dr. Alex Levin states, ". . . there has been no pediatric report of extensive RHs caused by increased ICP in the absence of abuse despite thousands of eye examinations of children with acute increased ICP from many other causes . . . ," and he cites multiple studies

which confirmed the absence of extensive RHs caused by increased ICP. Several other publications and studies are found in the medical literature, with similar findings.

*4) Is there such a phenomenon as a lucid interval and what is the likelihood of such phenomenon following the injury described in the records? Is it possible the Injury was inflicted earlier in the day without the child displaying lethargy, loss of appetite or consciousness?*

While the phenomenon of a lucid interval has been recognized in the medical literature, it is typically associated with extradural hemorrhage and, even then, is very uncommon in children; furthermore, even when unconsciousness is delayed, these children have not been described to be asymptomatic during this time. Rather, multiple studies have indicated that children with moderate to severe neurotrauma, as suffered by this child (significant subdural hemorrhage), become rapidly, clearly, and persistently ill. Therefore, given her injury pattern, it is my opinion that the onset of this child's symptoms would have evolved over the several minutes, and perhaps hour or two, after the injury, not several hours or days.

*5) Is it possible for bilateral retinal hemorrhaging to have occurred as a result of the brain surgery described in the records?*

There are reports in the medical literature of isolated retinal hemorrhaging resulting from neurosurgery, although this is certainly not common. In the presence of a skull fracture with underlying subdural hematoma, the overwhelming most likely cause of the bilateral retinal hemorrhaging was severe shaking and/or impact of the child's head. I cannot speak specifically to this child's retinal hemorrhaging, as I was not provided with any medical records describing the location, number, or pattern of retinal hemorrhaging, nor the date or report of the ophthalmologic exam.

Counsel said that during his meeting with the Petitioner shortly before trial, he and Co-counsel discussed with the Petitioner the medical records and that Co-counsel worked at the hospital and knew some of the doctors.

Counsel acknowledged that he regretted not objecting when the State brought Q.B. forward during the trial so that the State's expert could identify her injuries. He said that this action by the State elicited sympathy for Q.B. Counsel said that, while he did not think that the trial court would have granted his objection, he still regretted not lodging

9

one.  He agreed that the State called Q.B. forward during Dr. Lakin's testimony and that her disability was visible as she came forward.

Counsel further said he had no explanation for why he did not object during the State's closing argument, and said that he erred by not so doing.  He recalled that the State improperly referenced "little girls" during its closing.  He agreed the State said that the "community must protect these little girls."  He further agreed that, during closing, the State said that the Petitioner had shaken Q.B. and slammed "her little head against the floor."  He said that the State made the assertion despite the fact that there was no testimony supporting it.

Counsel testified about the Petitioner's plea negotiations.  He said that the Petitioner maintained his innocence, but, despite this, he strongly encouraged the Petitioner to take the State's offer of eight years.  The State gave the Petitioner until the Friday of the week before trial to accept the offer.  The morning of trial, the Petitioner asked if the State would reinstate their offer, and the State denied this request, stating that they had not initially realized the extent of Q.B.'s injuries.  The State offered the Petitioner a sentence of thirteen-and-a-half years, to be served at 100%.  The Petitioner declined this offer.

During cross-examination, Counsel testified that the Petitioner maintained his innocence, but he offered no explanation for Q.B.'s injuries.

Counsel testified that he was appointed to the Petitioner's case in June 2006 and that the trial was held in November 2007.  The Petitioner had thirteen scheduled trial dates, and Counsel met with the Petitioner on each of those occasions.  Counsel said that he had practiced law for twenty years and that he had handled quite a few Class A felony trials.  He said that he discussed the State's evidence with the Petitioner and told the Petitioner there was a "strong possibility" that a jury would convict him based on that evidence.  Counsel said that both he and Co-counsel informed the Petitioner that he should take the State's first plea offer.

Counsel said that an expert could both help and hurt a case in a trial like the Petitioner's trial.  He said that the expert would be subject to the State's cross-examination.  Considering Q.B.'s injuries as articulated in the medical records, he did not believe that there was an expert who could have aided in his defense.  He acknowledged that he was unaware that an expert may be able to pinpoint the timing of injury based upon blood shown on a CT scan.  He agreed that such an expert may have confirmed the timing of Q.B.'s injury as having occurred while she was alone with the Petitioner.  Counsel said that, after reviewing the affidavit of the Petitioner's proposed expert, he was still concerned with the cross-examination of such an expert.  The expert's findings

included that it was "unlikely" that Q.B.'s injuries were caused by her head colliding with the door and that the injuries could not have been caused by a minor opening a door into her head. The expert stated that, while there was a phenomenon called lucid interval, multiple studies indicated that children with moderate to severe neuro trauma become rapidly, clearly, and persistently ill. The expert further stated that, given Q.B.'s injuries, her symptoms would have evolved over several minutes and maybe an hour or two but not over several hours. Counsel said that this evidence did not help the Petitioner's defense.

Counsel opined that the trial court would have overruled any objection to the State's showing of Q.B.'s injuries. He said he did not object at the time because: (1) he thought the objection would be overruled; and (2) he thought the jury would think he was trying to hide the victim's injuries.

During redirect examination, Counsel agreed that he did not stipulate to the fact that Q.B. was severely injured to avoid the State from being able to show her injuries.

Co-counsel testified that he was a charge nurse on the weekends at LeBonheur Children's Hospital treating primarily pediatric patients and that he also worked for the public defender's office in Shelby County. Co-Counsel testified that he assisted in defending the Petitioner. He met with the Petitioner on between one and ten occasions, and he recalled reviewing the medical records with the Petitioner. He recalled telling the Petitioner that if the Petitioner did not inflict Q.B.'s injuries he needed to come forward and say who did. He implored the Petitioner to "not cover" for Ms. Williams.

Co-counsel said that the information in the medical records about the timing of the injuries were consistent with his experience. He also asked several of his colleagues at the hospital, who were neurosurgeons, about their opinion, and they agreed that the timing was consistent with the findings contained in the medical records. He said that, unfortunately, all of the information confirmed the testimony of the State's experts. He provided that information to the Petitioner. He agreed that he did not retain an expert for the Petitioner's case.

Co-counsel agreed that he attempted to argue that the injury could have been inflicted earlier. He also agreed that he did not back this up with medical proof. Co-counsel reviewed the affidavit of the Petitioner's proposed expert and said that he thought that the testimony would be "very, very detrimental to the client." Co-counsel also agreed that he did not present a theory of how Q.B.'s injuries occurred when he gave his closing argument. Co-counsel agreed that he did not object during closing argument.

During cross-examination, Co-counsel testified that nothing in the proposed expert's report led him to believe that it would have benefited the Petitioner. He agreed that the Petitioner and Ms. Williams brought Q.B. to the hospital at 4:00 a.m. Even if the injury occurred two hours before that, it was still within the time frame that the Petitioner was solely responsible for the care of the children. Counsel said that he urged the Petitioner to accept the State's eight-year plea offer because the trial would not go well considering the evidence against him.

During redirect examination, Co-counsel agreed that two hours before the initial onset of symptoms would have been around 1:00 a.m., when Ms. Williams and her brother were still at home.

Lillette Barlow, the Petitioner's mother, testified that she had seen the Petitioner interact with multiple children and that he was never violent towards them. She described him as "real content."

At the conclusion of the hearing, the post-conviction court denied the petition. It found:

> The [P]etitioner alleges ineffective assistance of trial counsel. The trial case involved the charge of Aggravated Child Abuse. The proof consisted of several medical experts who testified as to the extent of serious bodily injury suffered by the victim and several lay witnesses who provided via circumstantial evidence a time line for the [P]etitioner's opportunity to commit the crime. The [P]etition and both trial attorneys for the [P]etitioner testified at the hearing. The chief complaint against the trial attorneys was that they did not employ their own expert to contest the State's witnesses. At the evidentiary hearing the [P]etitioner provided an affidavit from a medical expert as to her opinion regarding certain allegations and questions raised by [P]etitioner. The Administrative Office of the Courts would not approve the hiring of an expert to testify in the post conviction hearing so the court allowed introduction of the expert's affidavit over objection by the State. Notwithstanding the opinion of the [P]etitioner's expert, which was basically consistent with the State's experts at trial, the court found that the [P]etitioner did not carry his burden of proof as to ineffective representation. The court specifically found that the [P]etitioner received very thorough and effective assistance of both trial attorneys during the trial. The court entered an oral finding of fact and conclusion of law and hereby incorporates that ruling into this order.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that his trial counsels were ineffective for: (1) not retaining an expert to undermine the State's experts' conclusions about the timing of the injury; (2) failing to object to closing argument; and (3) failing to have the Petitioner waive Co-counsel's conflict of interest. The Petitioner further contends that the law should be changed to allow expert witness funds in non-capital post-conviction cases.

### A. Ineffective Assistance of Counsel

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999*); Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We conclude that the post-conviction court did not err when it determined that the Petitioner had not proven by clear and convincing evidence that he had received the ineffective assistance of counsel. The Petitioner first argues that his trial counsels were ineffective for failing to retain an expert to dispute the State's experts' conclusions regarding the timing of Q.B.'s injuries. Co-counsel, however, who has medical training and experience stated that his review of the medical records led him to the same conclusions as the expert. He also consulted a neurosurgeon who confirmed the State's experts' opinions. After reviewing the proposed expert's affidavit, which this Court has also reviewed, Co-counsel said that he believed that the proposed expert's evidence could have been detrimental to the Petitioner's case. The affidavit did discuss that, while there was a possibility that the timing of the injury included a small window during which Ms. Williams and her brother were still at the home, it was more likely that this injury occurred shortly before Q.B. manifested symptoms of her injury. In our view, the affidavit supports Co-counsel's conclusions. The affidavit discusses an injury less severe than the one suffered by Q.B. and that the timing of the injury testified to by the State's expert was the most likely scenario. Both counsels, whom the trial court found credible, testified that after reviewing the proposed expert's affidavit, they still believed that the expert's testimony would not have benefited the Petitioner's case. We conclude that the Petitioner has not proven by clear and convincing evidence that he received the ineffective assistance of counsel in this regard. We further conclude that he did not prove that he was prejudiced by counsels' failure to retain an expert witness.

The Petitioner next contends that his counsels were ineffective for failing to object during the State's closing argument. Counsel agreed that he should have objected to the State's description of how the crime occurred, as it was not based upon testimony but instead speculation. We conclude that the post-conviction court did not err when it determined that the State's closing argument had no effect on the outcome of the trial. The Petitioner appealed his conviction, and, on appeal, he asserted that the State's closing argument was improper. We reviewed the issue, and we concluded that, "any incidents of alleged prosecutorial misconduct did not effect the outcome of the trial." *Barlow*, 2010 WL 1687772, at *23. The Petitioner has not proven by clear and convincing evidence that he was prejudiced by counsels' failure to object to the State's closing argument.

The Petitioner also asserts that counsels were ineffective for failing to have him waive Co-counsel's alleged conflict of interest. Tennessee Supreme Court Rule 8 states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Tenn. Sup. Ct. R. 8. "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)

(quoting Tenn. Sup. Ct. R. 8, EC 5-1)). "In the context of multiple employment, for example, an actual conflict arises where an attorney's continuance of such employment 'would be likely to involve the lawyer in representing differing interests.'" *White*, 114 S.W.3d at 476 (quoting Tenn. Sup. Ct. R. 8, DR 5-105(B)). There is a presumption of prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)); *see also Netters v. State*, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997); *State v. Thompson*, 768 S.W.2d 239, 245 (Tenn. 1989)).

We conclude that the Petitioner failed to establish that Co-counsel had an actual conflict of interest. The Petitioner was required to prove that Co-counsel's performance was deficient and that this deficiency prejudiced his defense. Co-counsel testified at the post-conviction hearing that, as a charge nurse, he had worked at some point with both of the State's expert witnesses. He said that he disclosed this fact to the Petitioner. The Petitioner acknowledged that he knew that Co-counsel had worked with these experts and agreed that he was fine with Co-counsel still representing him. We first conclude that Co-counsel's interaction with these two experts at the hospital did not present an actual conflict in that he was not representing differing interests. We further conclude that Co-counsel's working with the two experts at some point did not hinder his ability to cross-examine them, which he in fact did extensively. The Petitioner is not entitled to relief on this issue.

## B. Expert Witness Funds for Post-Conviction Hearing

The Petitioner urges us to change the law to provide for funds for expert witnesses in non-capital post-conviction cases. The Tennessee Supreme Court Rules clearly prohibit the authorization of expert services in non-capital post-conviction proceedings. Tenn. Sup. Ct. R. 13 § 5(a)(2); *see also* T.C.A. § 40-17-207; *Davis v. State*, 912 S.W.2d 689, 696-97 (Tenn. 1995). No authority exists to allow funds for experts in non-capital post-conviction cases. *Annette Tran Hamby v. State*, No. E2013-02383-CCA-R3-PC, 2014 WL 4181314, at *13 (Tenn. Crim. App., at Knoxville, Aug. 25, 2014), *no Tenn. R. App. P. 11 application filed*. The Petitioner is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

16